**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

_____

In re:

**Marilyn Munzberg**
**and Walter C. Munzberg,**
**Debtors.**

**Chapter 13 Case**
**# 07-10560**

Filed & Entered
On Docket
June 03, 2008

_____

*Appearances:* Rebecca Rice, Esq.    Martin A. Mooney, Esq.
       Rice & Cohen       Deily, Mooney & Glastetter, LLP
       Rutland, VT        Albany, NY
       For the Debtors      For the Creditor

**MEMORANDUM OF DECISION**
**ON CREDITOR'S OBJECTION TO PLAN CONFIRMATION**
**BASED UPON ITS RIGHTS UNDER THE "HANGING PARAGRAPH"**

   The Court is called upon to decide the extent to which the claim of DaimlerChrysler Financial Services Americas LLC (the "Creditor") is protected from bifurcation and cramdown in chapter 13, as a claim secured by a purchase money security interest ("PMSI"), where the claim includes not only the purchase price of a motor vehicle but also the purchase of gap insurance and a service contract, and "negative equity"[1] on a trade-in vehicle. This question, arising in the context of an objection to confirmation, requires the Court to interpret and apply the "hanging paragraph," found in 11 U.S.C. § 1325(a). Bankruptcy courts across the country have been bedeviled by this new provision. They have split on the question of whether negative equity and other elements of a vehicle purchase transaction may be secured by a PMSI and, if not, whether the hanging paragraph protects a claim from bifurcation (pursuant to 11 U.S.C. § 506) if only part of it is secured by a purchase money security interest.

   In this case of first impression in this District, the Court holds that: (1) the portions of the Creditor's claim allocable to negative equity and gap insurance are not secured by a PMSI and may be crammed down in a chapter 13 plan; (2) the portion of the claim allocable to the purchase of the vehicle and purchase of a service contract is secured by a PMSI and is protected from cramdown[2] by the hanging

---

[1] "Negative equity" is the difference between a vehicle's outstanding loan balance and its market value. General Motors Acceptance Corp. v. Peaslee, 373 B.R. 252, 254 (W.D.N.Y. 2007).

[2] To qualify for confirmation under Chapter 13, a debtor's plan has to satisfy the requirements set forth in § 1325(a). Secured claims, in particular, are governed by § 1325(a)(5). "Under this provision, a plan's proposed treatment of secured claims can be confirmed if one of three conditions is satisfied: The secured creditor accepts the plan; the debtor surrenders the property securing the claim to the creditor; or the debtor invokes the so-called "cram down" power. Under the cram down option, the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, see § 1325(a)(5)(B)(i), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, i.e., the present value of the collateral. The value of the allowed secured claim is governed by § 506(a) of the Code." Associates Commercial Corp. v. Rash, 520 U.S. 953, 956-57 (1997) (citations omitted).

paragraph; (3) it is appropriate to apply the dual-status approach to safeguard the PMSI portion of the security interest; and (4) the Debtors' pre-petition payments shall be allocated pro rata between the purchase-money obligation and the non-purchase-money obligation. Accordingly, the Court sustains, in part, the Creditor's objection to confirmation and will direct the Creditor to amend its proof of claim, and the Debtors to modify their plan, to conform to this decision.

## **FACTS AND PROCEDURAL HISTORY**

The facts in this case are not in dispute. Since the Creditor's Statement of Facts is more detailed, the Court generally adopts it and makes the following findings of fact:

1. On September 25, 2006, the Debtor [Marilyn Munzberg] purchased for her personal use, a 2006 Chrysler PT Cruiser from a dealer in Middlebury, Vermont.

2. In connection with the purchase, the Debtor traded in a 2004 Chrysler Sebring which she owned; the trade-in was subject to a lien. At the time she purchased the new vehicle, the Debtor owed more on the trade-in vehicle than its value.

3. As part of the deal, consistent with standard industry practice, the Debtor requested that the dealer pay off the lien on the trade-in vehicle as an element of the financing on the new vehicle. The negative equity amount was $8,242.11. The Debtor received a manufacturer's rebate of $2,000.00, which was applied against the negative equity in the RISC [retail installment sale contract], reducing the negative equity to $6,242.11.

4. The dealer agreed to finance the cash price of the new vehicle, the negative equity in the trade-in vehicle, gap insurance ($495.00), a service contract ($1,805.00), administrative and licensing fees, and taxes. The total amount financed, as defined by the RISFA [Vermont Retail Installment Sales Financing Act, 9 V.S.A. § 2355(f)(1)(D)], was $25,684.81, and included the negative equity, gap insurance and service contract. As part of the transaction, the debt on the trade-in vehicle was paid off and the lien was released.

5. The Debtor signed a retail installment contract by which she granted to the dealer a security interest in the new vehicle and disclosed the financing package total of $32,955.44 (the amount financed plus the finance charges) as the "Total Sale Price," as mandated by the federal Truth in Lending Act.

6. The Dealer assigned the contract to [the Creditor], which perfected its security interest by getting its name noted as lienholder on the Vermont certificate of title.

7. The Debtor filed a Chapter 13 bankruptcy case on August 29, 2007, within 910 days after purchasing the new vehicle.

8. [The Creditor] filed a proof of secured claim in the amount of $22,579.22 plus 8.59% interest. The Debtor's plan proposed to cram down [the Creditor's] claim.

9. The Debtor proposed an Amended Plan seeking to pay [the Creditor] the sum of $11,400.00 plus 9% interest.

10. In response, [the Creditor] objected to confirmation of the Debtor's plan on the ground that its full secured claim qualified for treatment under § 1325(a)(*) [the "hanging paragraph"] of the Bankruptcy Code, and thus could not be modified

through a cramdown." (doc. # 25).

In response to the Creditor's objection, the Debtors filed an Amended Plan that valued the vehicle at $11,400 and paid that sum with 9% interest, in monthly payments of $263.65, and paid the balance of the Creditor's claim a 0.89% dividend as part of the class of general unsecured claims (doc. # 14). On October 18, 2007, the Court held a confirmation hearing and confirmed the Amended Plan, subject to a determination of "whether [the Creditor's] claim can be modified." See confirmation order (doc. # 19). The parties subsequently filed memoranda of law (doc. ## 24, 25), and the Court took the matter under advisement.

## JURISDICTION

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334 and determines this to be a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## ISSUES PRESENTED

The Creditor's objection to confirmation raises four distinct issues. First, how is the term "purchase money security interest" defined for purposes of the hanging paragraph? Second, under that definition, does the hanging paragraph protect negative equity, gap insurance, and the service contract elements of a vehicle purchase transaction from cramdown? Third, does the anti-bifurcation protection of the hanging paragraph apply if only part of the Creditor's claim is secured by a PMSI? Finally, if the claim is divided into PMSI and non-PMSI components, how are the pre-petition payments allocated between those two components of the claim, when determining the amount of the Creditor's claim in this case?

## STATUTORY FRAMEWORK

The so-called "hanging paragraph" – an unnumbered paragraph added to the end of § 1325(a)(9) by the Bankruptcy Abuse Protection and Consumer Protection Act ("BAPCPA") – provides as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor.

§ 1325(a)(*).[3] The provision of § 506 pertinent here deals with claim "bifurcation" which, in the bankruptcy context, describes the procedure whereby "lien creditors are deemed to hold a secured claim only to the extent of the value of the property their lien encumbers. Beyond that amount, the balance the debtor owes is treated as a separate, unsecured claim." In re Look, 383 B.R. 210, 212 (Bankr. D.Me. 2008). Section 506 provides:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured

---

[3] This Court, like other courts, will use § 1325(a)(*) to denote the hanging paragraph.

claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

§ 506(a)(1).

Prior to BAPCPA, debtors could modify claims of creditors who financed the purchase of a vehicle and who held a lien on the car securing their claim. This "ability to bifurcate secured car loans, which was unqualified until BAPCPA's enactment, is now limited by the terms of the hanging paragraph." Look, 383 B.R. at 213. The hanging paragraph imposes four conditions that, if satisfied, will prevent a debtor from bifurcating the creditor's lien that arose when the debtor purchased a motor vehicle. It applies if the claim is: (1) secured by a "purchase money security interest"; (2) in a "motor vehicle"; (3) "acquired for the personal use of the debtor"; (4) within the "910-day [sic] preceding the date of the filing of the petition." § 1325(a)(*). At that point, "the creditor's claim is deemed fully secured[,] . . . not because the value of the vehicle is equal to the amount of the claim, as required by 11 U.S.C. § 506, but because the hanging paragraph found in 11 U.S.C. § 1325(a) so designates it by stating that 11 U.S.C. § 506 does not apply. . ." General Motors Acceptance Corp. v. Peaslee, 373 B.R. 252, 257 (W.D.N.Y. 2007) (quoting In re Belcher, 369 B.R. 465, 468 (Bankr.E.D. Ark. 2007)).

In this case, the parties do not dispute that the PT Cruiser was a "motor vehicle," "acquired for the personal use of the debtor" within the "910-day [sic] preceding the date of the filing of the petition." The legal issue before the Court is whether the claim is secured by a PMSI. That question, in turn, requires the Court to determine the scope of the PMSI, and in particular, whether funds advanced for the negative equity from the previous vehicle, as well as for the service contract and gap insurance financed in connection with the purchase of the current vehicle, are secured by a PMSI.

## DISCUSSION

### I. DEFINING "PURCHASE MONEY SECURITY INTEREST" FOR PURPOSES OF THE HANGING PARAGRAPH

Central to a determination of the scope of a PMSI in the context of the hanging paragraph is its definition. The Code does not define this critical term. This Court finds persuasive the rationale of those courts that have held that since PMSI is not defined in the Bankruptcy Code, bankruptcy courts should rely upon a state's UCC definition of PMSI to assess the applicability of the hanging paragraph to each dispute presented under § 1325(a)(*). The Sanders Court succinctly articulated the reasoning as follows:

> Congress is deemed to understand the context in which terms of art are used, and to intend the term to take on its ordinary meaning within that context. Envtl. Def. v. Duke Energy Corp., --- U.S. ----, 127 S.Ct. 1423, 1437, 167 L.Ed.2d 295 (2007) ("When Congress repeats the same word in a different statutory context, it is possible that Congress might have intended the context to alter the meaning of the word.")

4

> (citation omitted). Context is important because it gives courts insight into the meaning Congress may have intended. In addition, when a statutory term is undefined within a given piece of legislation, that term is normally expected to be given its ordinary and generally understood meaning within the statutory context. This is especially so when Congress employs a term of art that has acquired a meaning in the non-bankruptcy context. "Purchase money security interest," or "PMSI," is a term of art used in Article 9 of the Uniform Commercial Code, and it is fair to conclude that Congress was aware of this usage when it employed the term in the Bankruptcy Code. It is thus appropriate to examine UCC law to see what PMSI means in that context and to counsel our understanding of the meaning of PMSI within the context of this section of the Bankruptcy Code.

In re Sanders 377 B.R. 836, 845-46 (Bankr. W.D.Tex. 2007). Accord Look, 383 B.R. at 216-17; Peaslee, 373 B.R. at 275 ("Because the Bankruptcy Code does not define the term 'purchase money security interest,' courts have looked to state law to make that determination" (listing cases)). But see In re Westfall, 376 B.R. 210, 213 (Bankr. N.D.Ohio 2007) ("The maddeningly inconsistent body of decisions impels the conclusion that a consistent rule of law is needed. The most logical method of developing a consistent rule would be to develop a federal definition of purchase money applicable only in this narrow context."). As a general matter, this Court concludes that state law is the proper source for defining PMSI in the hanging paragraph.[4]

It is settled law that the UCC, adopted in Vermont's statutes at 9A V.S.A. § 9-101 et seq., determines whether a creditor holds a PMSI in goods owned by a debtor. In an adversary proceeding concerning the validity, priority, and extent of a lien claimed by a credit card issuer in goods sold under the terms of the Vermont Retail Installment Sales Act ("VRISA"), the Second Circuit Bankruptcy Appellate Panel ruled that "whether [the creditor] has a valid purchase money security interest is to be determined by looking to the provision of the Vermont UCC." In re Oszajca, 207 B.R. 41, 47-48 (2d Cir. BAP 1997).

The definition of PMSI found in Vermont's UCC statute follows that of many states which have adopted the text from Revised Article 9. The statute provides, in pertinent part:

§ 9-103. Purchase-money security interest; application of payments; burden of establishing

    (a)    In this section:
        (1)    "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
        (2)    "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for

---

[4] Reliance by federal courts upon state UCC provisions to construe terms that have a generally understood meaning under state commercial law is not new. Two decades ago, in the context of a lien avoidance action, the Tenth Circuit observed that the lack of a definition of PMSI in the Bankruptcy Code required turning to state law for guidance: "The Bankruptcy Code does not define "purchase money security interest." For this definition, the courts have uniformly looked to the law of the state in which the security interest is created." In re Billings, 838 F 2d 405, 406 (10th Cir. 1988). The Seventh Circuit reiterated this point last year when assessing the hanging paragraph's impact on a creditor's claim when a debtor surrendered a vehicle. It noted that, under Butner v. United States, 440 U.S. 48 (1979), "state law determines rights and obligations when the Code does not supply a federal rule." In re Wright, 492 F. 3d 829, 832 (7th Cir. 2007).

5

>> value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.
> (b) A security interest in goods is a purchase-money security interest:
> (1) to the extent that the goods are purchase-money collateral with respect to that security interest;

9A V.S.A. § 9-103.

Unfortunately, Vermont case law provides little guidance concerning what constitutes a PMSI or how 9A V.S.A. § 9-103(a) (or its precursor, § 9-107) is applied.[5] The Official Comment to V.S.A. § 9-103 provides some assistance. Paragraph 3 of the Official Comment ("Comment 3") states that the terms "purchase-money collateral" and "purchase-money obligation"

> are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" <u>includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.</u>
>
> The concept of "purchase-money security interest" requires a <u>close nexus between the acquisition of collateral and the secured obligation.</u> Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

Official Comment to 9A V.S.A. § 9-103, ¶ 3 (emphasis added). This UCC "definition" of PMSI has its drawbacks. Both parts of the two-part definition, "price" and "value given to enable," refer to the same non-exclusive list of eleven items as to what obligations may be secured by a PMSI. The two terms are not differentiated or defined in their own right, but are conflated. Moreover, the list does not include negative equity, gap insurance, or a service contract – the items in dispute in the majority of bankruptcy cases addressing the scope of a PMSI under the hanging paragraph. Comment 3 also fails to specify what constitutes, or how to measure, a "close nexus" between acquisition of the collateral and the secured obligation.

Fortunately, despite the dearth of Vermont case law concerning PMSIs, there is an ample supply of bankruptcy cases from states that have adopted the same Revised Article 9 and the Official Comments attached to that section. These cases have examined the scope of the hanging paragraph and whether various items included in a vehicle transaction (beyond the actual purchase price of the vehicle itself) fall within Comment 3's definition of purchase-money obligation. Many of these cases have been valuable to the Court in its determination of the extent of the Creditor's PMSI in the Debtors' vehicle and are discussed below.

---

[5] The one case published by the Vermont Supreme Court that refers to § 9-103 concerns the perfection of a security interest, see <u>Greggs Restaurant Equipment & Supplies, Inc. v. Valway</u>, 144 Vt. 59, 472 A.2d 1241 (1984), and the few earlier bankruptcy decisions from this Court referring to PMSIs are also inapposite.

## II. WHAT PART OF THE CREDITOR'S CLAIM IS SECURED BY A PMSI?

The parties do not dispute that the portion of claim allocable to the purchase of the PT Cruiser itself is secured by a PMSI. However, the fact that a part of the claim is secured by a PMSI does not mean that the entire claim is secured by a PMSI. The statute makes this clear when it says "a security interest in goods is a purchase-money security interest (1) <u>to the extent</u> that the goods are purchase-money collateral with respect to that security interest. . ." 9A V.S.A. § 9-103(b)(1) (emphasis added).

The Retail Installment Contract shows that the Debtors not only purchased a vehicle with a "cash price of $16,545," but also purchased gap insurance and a service contract, and rolled negative equity remaining from their previous car into the transaction. <u>See</u> copy of Vermont Retail Installment Contract (Exh. to doc. # 11). The question is whether the funds advanced to the Debtors for gap insurance, the service contract, and the negative equity component of the transaction are also secured by the Creditor's PMSI. The case law on this question is extensive. Two "camps" have formed: one holds that the new vehicle lender's PMSI encompasses all components of the transaction, <u>see</u>, <u>e.g.</u>, <u>In re Dunlap</u>, 383 B.R. 113 (Bankr. E.D.Wisc. 2008); <u>Peaslee</u>, 373 B.R. 252 (W.D.N.Y. 2007); <u>In re Schwalm</u>, 380 B.R. 63 (Bankr. M.D. Fla. 2008); <u>In re Burt</u>, 378 B.R. 352 (Bankr. D.Utah 2007); <u>In re Wall</u>, 376 B.R. 769 (Bankr. W.D.N.C. 2007); <u>In re Macon</u>, 376 B.R 778 (Bankr. S.D.N.C. 2007); <u>In re Cohrs</u>, 373 B.R. 107 (Bankr. E.D.Cal 2007); <u>In re Petrocci</u>, 370 B.R. 489 (Bankr. N.D.N.Y. 2007); <u>Graupner v. Nuvell Credit Corp.</u>, 356 B.R. 907 (M.D. Ga. 2007); <u>In re Turner</u>, 349 B.R. 437 (Bankr. D.S.C 2006); <u>In re Murray</u>, 346 B.R. 237 (Bankr. M.D. Ga. 2006); <u>In re Johnson</u>, 337 B.R. 269 (Bankr. M.D.N.C. 2006). The other camp holds that certain components of the loan, most notably negative equity, are not secured by the lender's PMSI, <u>see</u>, <u>e.g.</u>, <u>Look</u>, 383 B.R. 210 (Bankr. D.Me. 2008); <u>In re Callicott</u>, __ B.R. __, 2008 WL 1732934 (Bankr. E.D.Mo. Apr. 14, 2008); <u>In re Jernigan</u>, 2008 WL 922346 (Bankr. E.D.N.C. Mar. 31, 2008); <u>In re Wear</u>, 2008 WL 217172 (Bankr. W.D. Wash. Jan. 23, 2008); <u>In re Johnson</u>, 380 B.R. 236 (Bankr. D. Or. 2007); <u>In re Mitchell</u>, 379 B.R. 131 (Bankr. M.D. Tenn. 2007); <u>In re Conyers</u>, 379 B.R. 576 (Bankr. M.D.N.C. 2007); <u>In re Sanders</u>, 377 B.R. 836 (Bankr. W.D. Tex. 2007); <u>In re Blakeslee</u>, 377 B.R. 724 (Bankr. M.D.Fla. 2007); <u>In re Hayes</u>, 376 B.R. 655 (Bankr. M.D.Tenn. 2007); <u>In re Pajot</u>, 371 B.R. 139 (Bankr. E.D.Va. 2007); <u>In re Acaya</u>, 369 B.R. 564 (Bankr. N.D. Ca. 2007); <u>Citifinancial Auto v. Hernandez-Simpson</u>, 369 B.R. 36 (D.Kan. 2007); <u>In re Westfall</u>, 365 B.R. 755 (Bankr. N.D.Ohio 2007); <u>In re Price</u>, 363 B.R. 734 (Bankr. E.D.N.C. 2007); <u>In re Lavigne</u>, 2007 WL 3469454 (Bankr. E.D.Va. Nov. 14, 2007); <u>In re White</u>, 352 B.R. 633 (Bankr. E.D.La 2006); <u>In re Vega</u>, 344 B.R. 616 (Bankr. D.Kan. 2006). The sheer weight of the case law indicates that this latter approach has become the majority position.

### a. Negative Equity

The Creditor's argument in support of its position that negative equity is secured by a PMSI is that negative equity is an "expense[ ] incurred in connection with acquiring rights in the collateral" for purposes of both the "price" and "value given to enable" prongs of the definition (doc. # 25, pp. 13, 20). In

7

terms of "price," the Creditor asserts that "the portion[ ] of the new secured debt attributable to the rollover of the negative equity balance. . . are all obligations for expenses incurred [payoff of the prior lien holder. . .] in connection with acquiring rights in the collateral [the new vehicle]." Id. at 13. The Creditor cites the second paragraph of Comment 3, requiring a "close nexus between the acquisition of collateral and the secured obligation," and asserts that "there is a very close connection when the negative equity with respect to a trade-in vehicle is paid off by the seller of the new vehicle as part of its retail installment sale of the new vehicle, and the related obligation is included in the retail installment sale contract with the purchaser." Id. at 14. The Creditor expands upon this theme by stating that "[j]ust as it advanced the funds to satisfy the obligation to pay the cash price of the new vehicle, the dealer also gave "value" by advancing funds to satisfy the debt on the trade-in and thus 'enable' the debtor to acquire the new vehicle. It was a package deal." Id. at 20. Finally, the Creditor urges the Court to read the Vermont Motor Vehicle Retail Installment Sales Financing Act[6] (MVRISFA), 9 V.S.A. §§ 2351 et seq., in pari materia with the definition of "purchase-money obligation" in the Vermont UCC and "total sale price" in the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq. Id. at 21-24.

The Debtors contend that "[t]he portion of the contract amount that went to negative equity was not a price of the collateral," citing the definition of "cash price" under the MVRISFA (which does not include negative equity). They argue that negative equity is not "value given to enable" either, as the various items identified in the PMSI definition are actual transaction costs, and "[n]ot every expense that makes a transaction possible should be considered an enabling expense" (doc. # 24, pp. 6-8). Finally, the Debtors assert that the required "close nexus" does not exist because "[t]he financing of negative equity is effectively a separate financial transaction," and although it may be included in a single retail installment contract, that consolidation was only for the convenience of the consumer. Id. at 8.

### 1. Negative Equity as Antecedent and Unsecured Debt

Negative equity is antecedent debt, as it represents the amount financed on a debtor's previous car (Car 1) that remained unpaid at the point the debtor was in the process of purchasing a new car (Car 2). As such, the negative equity, and the collateral to which it was attached, pre-dated the purchase of Car 2. See Wear, 2008 WL 217172 at *3; Johnson, 380 B.R. at 243; Pajot, 371 B.R. at 154; Lavigne, 2007 WL 3469454 at * 6.

Comment 2 to UCC § 9-107 (the precursor to UCC § 9-103) explicitly provided that a purchase money security interest could not secure a pre-existing claim or antecedent debt. See In re Billings, 838 F.2d 405, 407 (10th Cir. 1988); Dominion Bank of Cumberlands, NA v. Nuckolls, 780 F.2d 408, 413 (4th

---

[6] In its brief, the Creditor refers to the Vermont Retail Installment Sales Financing Act, ("RISFA") 9 V.S.A. § 2351, and to the Vermont Motor Vehicle Retail Installment Sales Financing Act (MVRISFA), 9 V.S.A. § 2355. However, both 9 V.S.A. § 2351 and § 2355 are part of the Motor Vehicle Retail Installment Sales Financing Act: Section 2351 concerns "definitions," and Section 2355 refers specifically to "requirements and prohibitions as to retail installment contracts." It is therefore incorrect to describe Section 2351 as the Vermont Retail Installment Sales Financing Act.

Cir. 1985); In re Matthews, 724 F.2d 798, 800-01 (9th Cir. 1984); In re Penny, 15 B.R. 124, 127 (Bankr. E.D. Va. 1981). The current Official Comment 5 to 9A V.S.A. § 9-103 states that § 9-103(b), which describes when a security interest in goods and software is a PMSI, is limited to goods and software, but "[o]therwise, no change in meaning from former section 9-107 is intended." As a consequence, it appears that the definition of PMSI under former UCC § 9-107 has essentially not changed, and that Comment 2 to former § 9-107 is currently applicable, although that Comment was not retained in the Official Comments to the Revised Article 9. See Lavigne, 2007 WL 3469454 at * 6 (citing cases under former § 9-107 Comment 2 as still applicable to show that antecedent debt could not be PMSI). It is noteworthy that a PMSI relates only to the purchase of the collateral in question (Car 2), not to any other item, and that PMSI has not been expansively construed.[7]

In addition, negative equity is also unsecured debt, see Hayes, 376 B.R. at 672, because the debtor no longer owns the collateral (Car 1) from which the negative equity originated. The Pajot Court persuasively articulated how negative equity amounted to unsecured debt, and how the "close nexus" between the acquisition of the collateral and the secured obligation necessary to constitute a PMSI is lacking in negative equity financing:

> In essence, at the moment the first vehicle is "bought" by the second creditor as a trade-in, the secured debt held by the first creditor is satisfied by the value paid for the car. The deficiency – the amount the first creditor's debt exceeds collateral value as determined at the time of the trade – is the negative equity. This deficiency is unsecured just as it would be if the first creditor had foreclosed. Therefore, the substance of the transaction, though instantaneous, is that the second creditor is paying off the debtor's unsecured deficiency debt on the first vehicle. If the second creditor did not pay that debt off, the debtor would have the option of continuing to make payments to the first creditor, but that debt would be unsecured. The court sees no distinction between the substance of this transaction and paying off and rolling in any other unsecured debt that may be held by the debtor. The lender could just as easily pay off the debtor's student loans and roll that amount into a secured claim on the second vehicle. The only possible nexus is that the purpose of the first debt was to acquire a vehicle, and the second debt is also to acquire a vehicle. In sum, it is not clear that there is a close nexus between the negative equity payoff and the acquisition of the new vehicle.

Pajot, 371 B.R. at 154. Accord Johnson, 380 B.R. at 247 (opining that "the financed negative equity is nothing more than a refinance of the pre-existing debt owed on the Trade-In."); Hayes, 376 B.R. at 670

---

[7] In Johnson, 380 B.R. 236, the bankruptcy court discussed an earlier Ninth Circuit case, Matthews v. Transamerica Fin. Servs. (In re Matthews), 724 F.2d 798, 799-801 (9th Cir. 1984), that addressed the character of an enabling loan in deciding a motion to avoid a non-PMSI in debtor's property under § 522 of the Bankruptcy Code. The Johnson Court wrote, "While Matthews arises in the context of lien avoidance and predates the enactment of Revised Article 9, it is nevertheless instructive for this case. Prior UCC § 9-107 defined a PMSI as a security interest taken by a person who "gives value to enable the debtor to acquire rights in or use of collateral if such value is in fact so used. . . . Matthews articulates that a refinance constitutes value to enable debtors to pay off a loan, not to acquire rights in collateral." 380 B.R. at 247. Johnson further quoted Matthews, 724 F.2d at 801: "Purchase money security is an exceptional category in the statutory scheme that affords priority to its holder over other creditors, but only if the security is given for the precise purpose as defined in the statute. And we should not lose sight of the fact that the lender chooses the form." Johnson 380 B.R. at 247.

9

("It is not every dollar loaned that becomes <u>purchase-money obligation</u> by relationship in time or circumstances to the financing of <u>purchase-money collateral</u>.") (emphasis in original).

This reasoning, which the Court finds compelling, shows that a broad construction of "expenses incurred in connection with acquiring rights in the collateral" – to encompass expenses that relate to altogether different collateral that pre-dated the purchase of the new car – is inconsistent with the UCC. Comment 3 supports this position. It says that a security interest "does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price." Although that is not the situation here, the point is that an unsecured debt related to a prior transaction cannot be miraculously transformed into a purchase-money obligation solely by being enveloped in a later transaction. The court in <u>Sanders</u> succinctly summed this up: "One may borrow money to buy something (<u>e.g.</u>, a new vehicle), and also borrow additional money for some other purpose (<u>e.g.</u>, to pay off the balance of a loan for the trade-in vehicle). The part used to buy something is purchase money obligation. The part used for some other purpose is not." <u>Sanders</u>, 377 B.R. at 852-53.

The conclusion that negative equity is not secured by a PMSI has significant policy underpinnings. If a creditor could secure negative equity with a PMSI, it would not only receive the non-bifurcation advantage provided by 1325(a)(*) to the extent of the money spent to purchase the new car, but the creditor would have the additional advantage of being able to refinance old unsecured debt and turn that amount not only into secured debt, but into PMSI secured debt. While the hanging paragraph was geared to provide creditors with a benefit and prevent perceived pre-BAPCPA abuses, nothing in the hanging paragraph's legislative history suggests that Congress intended automobile lenders to be able to immunize themselves against cramdown for any loans beyond those made for the debtor's purchase of a vehicle within 910 days of a bankruptcy filing. To extend this protection to encompass the conversion of unsecured debt into secured debt, immune from cramdown, would be a windfall to automobile lenders and would be unfair to other creditors who hold unsecured claims. That result would appear to be well beyond the scope of what Congress contemplated or intended when it created the hanging paragraph relief.

Accordingly, this Court holds that negative equity is not an expense incurred "in connection with acquiring rights in the collateral" and that it does not have the requisite "close nexus" with the acquisition of the collateral to be secured by the PMSI the Creditor holds in the Debtors' vehicle.

### 2. Should the Vermont MVRISFA be read <u>in pari materia</u> with the UCC?

The Creditor urges the Court to read the MVRISFA <u>in pari materia</u>[8] with the definition of "purchase-money obligation" in the UCC (doc. # 25, pp. 21-24). The Creditor notes that the MVRISFA

---

[8] Black's Law Dictionary (8th ed. 2004) defines "<u>in pari materia</u>" as "on the same subject, relating to the same matter. It is a canon of construction that statutes that are <u>in pari materia</u> may be construed together, so that inconsistencies in one statute may be resolved by looking at another statute on the same subject."

provides that a retail installment contract must contain, among other items, "the amount, if any, paid or to be paid by the seller pursuant to an agreement with the buyer to discharge a security interest, lien interest, or lease interest on the traded in motor vehicle" and "[a] disclosure form. . . containing at least the allowance for trade-in, amount owed on the trade in. . ." 9 V.S.A. § 2355(f)(1)(D) and (J).[9] The Creditor then argues that 9A V.S.A. § 9-103 and MVRISFA should be read "in pari materia" since the definition of purchase money obligation and price of the collateral should be read to include negative equity, insurance, service contracts just as those elements are packaged together with the amount financed in the MVRISFA. The Creditor asserts that the two statutes "deal with the same subject matter: secured installment financing of consumer motor vehicles," and the UCC (9A V.S.A. § 9-201(b)) references the MVRISFA (doc. # 25, p. 23). The Creditor also posits that both the Vermont UCC and MVRISFA should be read in pari materia with the federal Truth in Lending Act ("TILA") that applies to the same subject matter – applicable disclosure requirements of financed purchases of consumer goods – noting that MVRISFA incorporates TILA's disclosure requirements.

This is the one area where Vermont case law assists the Court in resolving the questions presented in this case. In In re Oszajca, 207 B.R. 41 (2d Cir. BAP 1997), the Second Circuit BAP reversed the bankruptcy court's holding that the retention of a PMSI, in connection with a retail charge agreement, was prohibited under the Vermont Retail Installment Sales Act ("VRISA"), 9 V.S.A. §§ 2401-2410. In the course of its discussion, the BAP observed that "[a]s is true under the federal Truth in Lending Act, state statutes affording consumer protection are directed to disclosure," and "[t]he VRISA is simply a disclosure statute relating to retail installment sales legislation" which "allow[s] the consumer to shop and compare and obtain the best deal." Id. at 44, 45, 47. The panel went on to say that the VRISA "does not directly authorize or prohibit security interests in consumer goods purchased under a retail charge agreement," and "in states where the RISA statutes do not refer to a security interest, courts look to the provisions of the Uniform Commercial Code (the "UCC"), as adopted by the specific state, to determine if the seller has a valid security interest in consumer goods." Id. at 45. Oszajca cited with approval Brown v. Jenkins, 135 Ga.App. 694, 218 S.E.2d 690, 692 (1975), which pointed out that retail installment sales act statutes have "nothing to do with the creation, duration, definition, or enforcement of purchase money security interests in consumer goods. . ." 207 B.R. at 46. The BAP adopted Brown's reasoning and held that whether a PMSI was valid "is properly determined by looking to the provisions of Vermont's UCC statute, not the VRISA." Id.

The Vermont MVRISFA relates to a particular subset of retail installment sales, and the statement in Oszajca regarding the VRISA applies equally to the MVRISFA: "Generally the purpose of retail installment sales legislation is to protect retail buyers of goods from unknowingly assuming excessive

---

[9] In addition, 9 V.S.A. § 2355(f)(1)(D) allows a contract to include the amount, if any, for credit life and damage insurance and service contracts. The Creditor reads this as "explicitly authoriz[ing]" gap insurance (doc. # 25 p. 22).

11

charges by requiring that all charges and terms be set forth by a retail seller before a contract is signed by a buyer." Id. at 44. This Court finds that the same constraints that the Oszajca court found with regard to the VRISA applies to the MVRISFA: it is a disclosure statute that neither authorizes nor permits security interests in consumer goods; the proper place to look for such guidance is the UCC.

In order for a statute to be read in pari materia with another, the two statutes must be part of a common statutory scheme that addresses the same subject matter or must share a common purpose. See State v. Baron, 176 Vt. 314, 319, 848 A.2d 275, 279 (2004). The MVRISFA, as stated above, is a disclosure statute. Article 9 of the UCC, on the other hand, concerns the creation of a security interest in goods, and Section 9-103 "explains when a security interest enjoys purchase-money status." 9A V.S.A. § 9-103, Official Comment 2. The MVRISFA does not address the same subject matter nor does it share a common purpose with the UCC and therefore the two statutes cannot be read in pari materia with each other. Neither can TILA be read in pari materia with the UCC, as the TILA is also a

> consumer disclosure statute. It does not relate to the same subject matter as the Uniform Commercial Code, which deals with consensual security interests in personal property and fixtures. Although the Federal Truth in Lending Act requires that the amount of negative equity be disclosed as a component of the purchase price, this disclosure obligation does not transform the pre-existing indebtedness into a component of the cost of the vehicle.

Lavigne, 2007 WL 3469454 at * 7.

This conclusion is important because the Creditor's argument that negative equity should be included within the scope of a purchase-money obligation, i.e., secured by a PMSI, depends in large part on the UCC being read in pari materia with the MVRISFA. A number of the leading cases holding that negative equity is included in the scope of the claim secured by a PMSI, including Peaslee, 373 B.R. 252 and Graupner, 2007 356 B.R. 907, relied on in pari materia arguments to buttress their conclusions.[10] Such arguments have no such traction in Vermont.

Accordingly, this Court holds that negative equity from a prior vehicle cannot be secured by the Creditor's PMSI in the Debtors' vehicle.

**b. Gap Insurance**

Gap insurance "is insurance that protects the debtor and, indirectly, the secured creditor. Gap insurance covers that part of the damage that exceeds the value of the automobile, up to the outstanding balance of the secured loan." Price, 363 B.R. at 741. This Court adopts Price's reasoning and its conclusion that gap insurance is not part of the purchase price of the collateral, and thus does not come within

---

[10] In Peaslee and Graupner, the courts relied upon the definition of "cash sale price" in New York's and Georgia's Motor Vehicle Retail Installment Sales Act, respectively, as providing "additional statutory support to conclude that the unpaid balance on a trade-in vehicle can and should be considered part of a purchase price on the new vehicle and, therefore, entitled to a purchase money security interest" because the two statutes included negative equity in their definitions of cash price. Peaslee, 373 B.R. at 259-60. Accord Graupner, 356 B.R. at 918 (reading portions of Georgia's § 9-103 in pari materia with the Motor Vehicle Sales Finance Act).

12

the scope of the debt secured by a PMSI. The <u>Price</u> Court found that gap insurance was "neither mandatory, a component of the loan agreement, nor a value-enhancing add on, and thus is dissimilar to the examples listed in the Official Comment to the [state] statute defining purchase money security interest." <u>Id.</u> Accord <u>Jernigan</u>, 2008 WL 922346 at * 2 (following <u>Price</u>); <u>In re Honcoop</u>, 377 B.R. 719, 723 (Bankr. M.D.Fla. 2007) (holding that gap insurance protects owner of vehicle and does not involve "overall enhancement of the vehicle"); <u>Pajot</u>, 371 B.R. at 155 (following <u>Price</u>); <u>White</u>, 352 B.R. at 639 (holding that gap insurance is not part of the purchase price because the contract was a separate asset, independent of the vehicle purchase and its cost was paid to a third party, separate from the seller). But see <u>Macon</u>, 376 B.R. at 782 (holding that gap insurance had sufficient nexus with price of the vehicle, since Debtor elected additional items as part of the transaction to protect the vehicle, added value for the Debtor to the consideration received, and had no value unless incorporated into the purchase of the vehicle).

**c.   Service Contract**

On the other hand, the majority of cases that have analyzed whether a service contract (or extended warranty) is properly considered within the scope of the obligation secured by a PMSI have held that it is. The service contract follows the car, and increases the car's value. As the court held in <u>Jernigan</u>, this charge is "so tied to the value of the collateral that [it] fall[s] within the meaning of purchase money obligation under the [state UCC statutes]." 2008 WL 922346 at *2. Accord <u>Riach</u>, 2008 WL 474384 at *4; <u>In re Murray</u>, 346 B.R. 237, 240 (Bankr. M.D.Ga. 2006), <u>In re Johnson</u>, 337 B.R. 269, 272-73 (Bankr. M.D.N.C. 2006); <u>Pajot</u>, 371 B.R. at 155; <u>Macon</u>, 376 B.R. at 782. But see <u>White</u>, 352 B.R. at 639 (extended warranty was not cost of acquiring vehicle and thus charge was not part of PMSI).

This Court also holds that a service contract is properly considered part of the purchase-money obligation and is thus secured here by the Creditor's PMSI.

**III.   DOES THE HANGING PARAGRAPH PROTECT A CLAIM FROM BIFURCATION IF ONLY PART OF IT IS SECURED BY A PMSI? ADOPTION OF THE DUAL-STATUS RULE.**

Having determined that negative equity and the cost of the gap insurance are non-purchase money obligations, and that the vehicle purchase price and the purchase of the service contract are purchase-money obligations, the Court must determine how to construe the hanging paragraph where a single security interest contains both PMSI and non-PMSI components. By its terms, the hanging paragraph applies to a claim that is secured by a PMSI, but it is not clear whether a claim that is secured only partially by a PMSI retains all or only some of its PMSI character when the non-PMSI arose in the same transaction. In the absence of any guidance in the Bankruptcy Code or the legislative history of the hanging paragraph, the Court again turns to the UCC.

> [The UCC] has traditionally used two approaches. The "transformation rule" holds that a security interest that is part purchase-money and part non-purchase-money completely loses its purchase-money character and is entirely transformed into a non-purchase-money security interest. See <u>In re Price</u>, 363 B.R. at 745. The "dual

13

status rule" allows the court to treat the portion that is purchase-money (essentially the purchase price) as purchase-money, whereas the non-purchase-money portion remains non-purchase-money and is treated accordingly. See id.

Pajot, 371 B.R. at 157. See 9A V.S.A. § 9-103(f) (discussing an obligation in non-consumer goods transactions that contains a security interest that is partially PMSI and partially non-PMSI).[11]

While it is true that the UCC authorizes courts to choose between these two approaches, that does not resolve the issue presented in the context of the hanging paragraph because Official Comment 7 to 9A V.S.A. § 9-103 states that the dual-status rule is only applicable to non-consumer goods transactions, and the transaction at issue is a consumer goods transaction. The Vermont UCC statute at 9A V.S.A. § 9-103(h), and its Official Comment 8, specifically "leave[ ] to the court the determination of the proper rules in consumer-goods transactions." Id. at Official Comment 8.[12] Once again, courts are split on the issue of whether to apply the transformation or dual-status rule, with the balance handily tipping in favor of the dual-status approach. Among the courts following the transformation rule are Blakeslee, 377 B.R. at 730; Westfall, 365 B.R. at 763; Price, 363 B.R. at 746; In re Peaslee, 358 B.R. 545, 558-59 (Bankr. W.D.N.Y. 2006), rev'd by Peaslee, 373 B.R. 252. Among the courts following the dual-status rule are: Riach, 2008 WL 474384 at *4; Wear, 2008 WL 217172 at *4; Callicott, 2008 WL 1732934 at *4; Johnson, 380 B.R. at 250; Conyers, 379 B.R. at 582-83; Honcoop, 377 B.R. at 724; Hayes, 376 B.R. at 676; Westfall, 376 B.R. at 219; Pajot, 371 B.R. at 157; Hernandez-Simpson, 369 B.R. at 46; Acaya, 369 B.R. at 570; Lavigne, 2007 WL 3469454 at *11-12; Vega, 344 B.R. at 622 & n.29; Ericksen, 2006 WL 4846379 at *3. But see Sanders, 377 B.R. at 858-64 (holding that, because financing used to pay off negative equity is not a purchase-money obligation, the hanging paragraph does not apply and the claim is subject to treatment under § 506(a)); Look, 383 B.R. at 220 (agreeing with Sanders that although bankruptcy courts must look to state law to determine content of PMSI, it is unnecessary and inappropriate to look to state law to determine consequences of determination that lien is not a PMSI). In this Circuit, a district court in the Southern District of New York opted for the dual-status rule, stating that "the more modern trend is to recognize that only the security interest which secures the non-purchase price debt is not a PMSI, but the interest which secures the purchase price debt retains its PMSI character." In re

---

[11] 9A V.S.A. § 9-103(f) provides:
> In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if:
>> (1) the purchase-money collateral also secures the purchase-money obligation;
>> (2) collateral that is not purchase-money collateral also secures the purchase-money obligation; or
>> (3) the purchase-money obligation has been renewed, refinanced, consolidated, or restructured.

[12] 9A V.S.A. § 9-103(h) provides:
> The limitation of the rules in subsections (e), (f), and (g) to transactions other than consumer-goods transaction is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

Ionosphere Clubs, Inc., 123 B.R. 166, 171 (S.D.N.Y. 1991) (citing Pristas v. Landaus of Plymouth, Inc., 742 F.2d 797, 800 (3d Cir. 1984)).

The legislative history of the hanging paragraph leaves little doubt that its "architects intended only good things for car lenders and other lienholders." In re Long 519 F.3d 288, 294 (6th Cir. 2008) (citation omitted). See, e.g., Peaslee, 373 B.R. at 261 ("To the extent that it is possible to glean any Congressional intent behind the hanging paragraph . . . that intent . . .seems to be to protect creditors from the abuse of 'cramdown'"); In re Payne, 347 B.R. 278, 281 (Bankr. S.D. Ohio 2006) ("Congress was attempting to remedy a perceived abuse by those who buy vehicles on credit on the eve of bankruptcy and then utilize the cramdown provisions of the Bankruptcy Code to pay the secured creditor a lesser amount than its full claim."); In re Duke, 345 B.R. 806, 809 (Bankr.W.D.Ky.2006) ("It is interesting to note that the section of BAPCPA that added the hanging paragraph was entitled, 'Section 306-Giving Secured Creditors Fair Treatment in Chapter 13 ... Restoring the Foundation for Secured Credit.'"). This Court agrees with the analysis in Lavigne that application of the dual-status rule advances Congress's intent in amending § 1325(a) to include the hanging paragraph. That court explained:

> When a debtor purchases a car, its value decreases substantially from the moment that the car leaves the dealership. Congress intended to stop the practice by which debtors could cram down a creditor's secured claim on a motor vehicle purchased within the 910-day period preceding bankruptcy by bifurcating a secured creditor's claim into secured and unsecured portions based upon the value of the collateral. If this Court were to adopt the transformation rule, then debtors would be able to decrease the amount of the secured claims to the value of their motor vehicle simply because the creditors also paid for the debtors' negative equity in their trade-in vehicles. It is not likely that Congress intended such a result.

Lavigne, 2007 WL 3469454 at * 11. The Vermont UCC statute supports this position. 9A V.S.A. § 9-103(b) states that a security interest in goods is a PMSI "to the extent that the goods are purchase-money collateral with respect to that security interest" (emphasis added). This "to the extent" language "suggests that the collateral can secure more than its purchase price while retaining its purchase money character as to the amount of the purchase price."[13] Lavigne, 2007 WL 3469454 at *11.

Accordingly, this Court adopts the dual-status rule and determines the Creditor's claim (totaling $25,684.81) to be secured in part by a PMSI and in part by a non-PMSI. The negative equity ($6,242.11) and gap insurance ($495) are not purchase-money obligations, and therefore, the sum of $6,737.11 is secured by a non-PMSI. Subtracting that amount from $25,684.81 (the total amount financed), leaves a

---

[13] Pajot adds the caveat that some courts have applied the transformation rule because it is easier to administer. The court was concerned, however, that the actual purchase price of a vehicle might be subject to manipulation by car dealerships and that creditors could manipulate the value of their secured claim by increasing the price of the vehicle and lowering the price of the non-purchase money items. It reasoned that since the choice between dual status and transformation is left to the court's discretion, it may determine "on a case by case basis that certain transaction details are not clearly articulated enough to apply the dual status rule." Pajot, 371 B.R. at 163. Pajot held that if a "negative equity transaction is structured such as to obfuscate transaction details or otherwise abuse the dual status rule, this court will not hesitate to discretionarily apply the more stringent transformation rule." Id. at 164. This Court also leaves open that option, should circumstances warrant.

purchase-money obligation of $18,947.70, attributable to the purchase of the PT Cruiser (including fees) and the service contract, secured by a PMSI.

## IV. ALLOCATION OF PRE-PETITION PAYMENTS BETWEEN PMSI AND NON-PMSI PORTIONS OF THE CLAIM

Having made determinations concerning the more complicated aspects of this contested matter, the Court is left with the essence of the Creditor's objection: what is the scope and extent of the Creditor's PMSI? This is a straightforward issue of bankruptcy law. Bankruptcy courts regularly determine the nature, validity, priority, and scope of a lien or security interest in the context of objections to claim, objections to confirmation, and adversary proceedings between a trustee or debtor and putative secured creditor. The Court has already found that, under pertinent state law, the Creditor's claim is secured in part by a valid PMSI, and that the PMSI-secured part of its claim is entitled to the special anti-bifurcation protection afforded by the hanging paragraph. The remaining question is the extent of that PMSI. The Court has determined that only the vehicle purchase price, fees, and service contract elements of the underlying loan transaction are properly categorized as purchase-money obligations, thereby establishing that the outer limit of the PMSI would be the amount of the Creditor's claim attributable to these three elements. Typically, the amount of the allowed claim would be computed by simply applying the pre-petition payments to the initial balance of the purchase-money obligation. However, that does not work here. The Debtors made payments, pre-petition, on a single, unified debt. In order to apply the hanging paragraph, it was necessary to recharacterize the debt as two distinct claims: one secured by a PMSI and the other secured by a non-PMSI. The amount due on each claim as of the petition date – and thus the amount of the claim protected from bifurcation by the hanging paragraph – depends on how those pre-petition payments are allocated.

The Bankruptcy Code does not provide guidance on this issue, and the Vermont UCC only provides guidance on allocation of payments for non-consumer transactions,[14] allowing courts the discretion, pursuant to 9A V.S.A. § 9-103(h), to fashion their own rules in consumer transactions. Most courts applying the dual-status rule have opted for a proportional allocation, pro rating the pre-bankruptcy payments between the purchase-money and non-purchase money portions of the claim. See Jernigan,

---

[14] 9A V.S.A. § 9-103(e) provides:
    In a transaction other than a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation the payment must be applied:
    (1)    in accordance with any reasonable methods of application to which the parties agree;
    (2)    in the absence of the parties' agreement to a reasonable method, in accordance with any intention of the obligor manifested at or before the time of payment; or
    (3)    in the absence of an agreement to a reasonable method and a timely manifestation of the obligor's intention, in the following order:
        (A)    to obligations that are not secured; and
        (B)    if more than one obligation is secured, to obligations secured by purchase-money security interests in the order in which those obligations were incurred.

16

2008 WL 922346 at *2; Riach, 2008 WL 474374 at * 4-5; Conyers, 379 B.R. at 583; Pajot, 371 B.R. at 161-63; Lavigne, 2007 WL 3469454 at * 12.

The courts using a pro rata approach explain that it is the "most equitable manner of allocating payments," Conyers, 379 B.R. at 583, particularly where it would be difficult "in determining the number and amount of payments received because of interest and penalties accruing over time." Lavigne, 2007 WL 3469454 at * 12. Since the two newly-designated claims constituted a single secured claim pre-petition, this Court agrees that a pro rata allocation is appropriate and sound.

This allocation of pre-petition payments, however, is not self-effectuating; it must be effectuated through the claims allowance process. See Fed. R. Bankr. P. 3002(a). In bankruptcy, the burden of proof for establishing the amount of one's proof of claim is on the party asserting the claim. In re Barone, 2008 WL 783523 at * 4 (Bankr. D.Conn. Mar. 25, 2008). The Creditor must therefore file an amended proof of claim showing that the pre-petition payments have been credited pro rata against the PMSI-secured and non-PMSI secured portions of the claim.

## CONCLUSION

For the reasons set forth above, the Court reaches the following determinations. First, the Vermont UCC definition of PMSI applies for purposes of construing the applicability of the hanging paragraph's anti-bifurcation protection to secured claims. Second, the Creditor's PMSI secures only the portion of the loan it made for the purchase price of the new vehicle, fees, and purchase of a service contract; the balance of the Creditor's claim, allocable to negative equity and the purchase of gap insurance, is secured by a non-PMSI. Third, following the dual-status rule, the anti-bifurcation protection of the hanging paragraph applies to that part of the Creditor's claim that is secured by a PMSI, notwithstanding that a portion of the claim is not secured by a PMSI. Fourth, to ascertain what amount of the Creditor's claim is secured by a PMSI, the Creditor shall recompute the amount due, segregating the claim into the two components (PMSI and non-PMSI) and applying the pre-petition payments pro rata to these two components of the claim. Fifth, the Debtors must modify their Amended Plan to reflect the two distinct components of the Creditor's claim and treat the entire PMSI component as secured pursuant to the hanging paragraph. The portion of the claim that is not secured by a PMSI is, of course, subject to bifurcation under § 506 and cramdown under § 1325(a)(5).

Therefore, the Court sustains the Creditor's objection in part and will direct the Creditor to amend its proof of claim to reflect the two components of its claim and the proper allocation of pre-petition payments. The Court will also direct the Debtor to modify the confirmed Amended Plan to specify the treatment of each component of the Creditor's claim to conform to the rulings set forth in this memorandum of decision.

This constitutes the Court's findings of fact and conclusions of law.

June 3, 2008  
Rutland, Vermont

Colleen A. Brown  
United States Bankruptcy Judge